## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Case No.** _____ |
| **S.F. ADVISORS, LLC, d/b/a AFFINITY CLUB NETWORK, LLC, JOHN LAROCCA, RAVI V. KOTHARE, and DAVID M. MASER** | ) ) ) ) ) | |
| **Defendants.** | ) | |

### PLAINTIFF'S MEMORANDUM IN SUPPORT OF
### ITS MOTION FOR PRELIMINARY INJUNCTION

As the Verified Complaint, this Expedited Motion and the Declaration of Judy S. Heeter demonstrate, the Players Association is likely to succeed on the merits of its claims. ACN is no longer licensed the Players Association, and thus its continued use of the Player Rights for commercial purposes violates publicity rights of the Players Association's members, as well as the Players Association's exclusive contract rights. ACN's unauthorized use of the Players Association's marks violate the Lanham Act and the Players Association's common law trademark rights. Because of these violations and because the Players Association has been and continues to be irreparably injured by ACN's actions, the Players Association is entitled to a preliminary injunction enjoining ACN and the other defendants from (1) continuing to use MLB player names and likenesses for commercial purposes; and (2) continuing to use the PLAYERS CHOICE CLUB, PLAYERS CHOICE and/or PLAYERS CHOICE and Design name in any format whatsoever, including the use of the marks on ACN's websites.

1980335.2

Dockets.Justia.com

## BACKGROUND

Virtually every active Major League baseball player signs a commercial authorization agreement granting the Players Association the exclusive right to license that player's name and other personal indicia in connection with products or services that involve three (3) or more Major League players ("Player Rights"). *See* Heeter Declaration ¶ 3. The Players Association's group licensing program generates income which is distributed among all Major League baseball players. *See* Heeter Declaration ¶ 4. The Players Association's group licensing program is strictly controlled so as to protect and enhance players' reputations and prevent over-exposure and dilution of the value of the players' publicity rights, as well as the value of a Players Association's license. *See* Heeter Declaration ¶ 4. The Players Association has been granting licenses for the use of these rights for approximately forty years. *See* Heeter Declaration ¶ 4.

When the Players Association grants a license to use the name or likeness of a player, it also licenses the use of the Players Association logo and trademarks. *See* Heeter Declaration, ¶ 5. The Players Association is the owner of multiple trademark registrations such as the PLAYERS CHOICE, PLAYERS CHOICE and Design and PLAYERS CHOICE CLUB trademarks. *See* Heeter Declaration, ¶ 5.

### ACN's License Agreement With the Players Association

ACN is a business that offers direct-marketing baseball membership clubs, through its websites, www.playerschoiceclub.com and www.playerschoicegold.com. *See* Verified Complaint, ¶ 17. ACN offers its club members discounted baseball-related products as well as other services and access to events at which current or former Major League baseball players are present. For instance, ACN represents to its members that they are entitled to participate in city-by-city, year-round special events in which fans meet players in off-the-field settings. Other purported membership benefits include allowing members to accumulate monthly points that

can, in turn, be redeemed for authentic player autographs and passes to ACN's special events, as well as certain custom collectibles and savings on player-licensed products. *See* Verified Complaint, ¶ 16.

ACN's websites contain photographs, names, likenesses and other personal indicia of active Major League baseball players. *See* Verified Complaint, ¶ 18. The Players Association's PLAYERS CHOICE, PLAYERS CHOICE and Design, and PLAYERS CHOICE CLUB marks are also contained throughout ACN's website. *See* Verified Complaint, ¶ 19. Further, ACN's websites also specifically represent that ACN is "licensed by the Major League Baseball Players Association." *See* Verified Complaint, ¶ 20.

On November 15, 2004, the Players Association entered into a license agreement ("License Agreement") with ACN whereby the Players Association gave ACN a license to operate "player membership clubs" utilizing the PLAYERS CHOICE CLUB mark, as well as other Player Rights to provide benefits for ACN network members. *See* Verified Complaint, ¶ 21. In the License Agreement, ACN acknowledged the Players Association's exclusive group licensing rights and that ACN required a license from the Players Association to lawfully operate its direct-marketing membership clubs. *See* Verified Complaint, ¶ 22.

Pursuant to the terms of the License Agreement, ACN was to make royalty payments to the Players Association, based on percentages of membership fees, members' purchases of products, and sale of other sports and entertainment membership clubs. *See* Verified Complaint, ¶ 23. The License Agreement provided that ACN was to pay the Players Association certain guaranteed minimum royalties throughout the contract. The License Agreement contained a "Post-Termination" provision that allowed the Players Association the right to immediately terminate the License Agreement where ACN failed to make royalty payments twice in a twelve-

3

month period. *See* Verified Complaint, ¶ 24. In the License Agreement, ACN contractually agreed not operate its membership clubs or use the Players Association's trademarks after the termination of the agreement. *See* Verified Complaint, ¶ 27.

The Post-Termination clause also provides that failure to cease the advertisement, promotion and/or use of the Licensed Products will result in immediate and irreparable damage to the Players Association. ACN acknowledged that there is no adequate remedy at law for failure to cease such activities, and that the Players Association may commence an action in any court having jurisdiction and shall be entitled in such court to equitable relief and such other relief as a court may deem just and proper. *See* Verified Complaint, ¶ 30.

### ACN's Breaches of the License Agreement

In 2006, ACN failed to pay $200,000 towards the guarantee minimum royalty, due on or before June 30, 2006. *See* Heeter Declaration, ¶ 7. ACN also failed to pay the sum of $350,000, due on or before September 30, 2006. *See* Heeter Declaration, ¶ 7. On October 23, 2006, the Players Association notified ACN that its License Agreement had been terminated. *See* Verified Complaint, ¶ 37. In the termination letter, the Players Association advised ACN of certain post-termination obligations, including the discontinuation of all uses of the Player Rights and of the Players Association's trademarks.

On October 25, 2006, ACN sent an e-mail notification to its current members that utilized the PLAYERS CHOICE marks and indicated that member benefits would continue until December 31, 2006. *See* Verified Complaint, ¶ 39. ACN's indication that membership benefits will run through the end of 2006 is contrary to the immediate termination provisions in the License Agreement. *See* Verified Complaint, ¶ 40. Further, ACN's e-mail suggests that new club(s) will continue to utilize Player Rights in 2007, which is also contrary to the post-

4

termination provisions and ACN's acknowledgement of the Player Association's rights contained in the License Agreement. *See* Heeter Declaration, ¶ 9.

### ACN's Unauthorized Use of the Player Rights and the Players Association's Marks

On November 2, 2006, the Players Association's outside counsel sent a letter to ACN, demanding that ACN immediately cease its use of the Players Association's Marks, cease any activity which utilizes the Player Rights without authority from the Players Association, and to fulfill its post-termination obligations pursuant to the License Agreement. *See* Verified Complaint, ¶ 41.

On November 7, 2006, ACN sent a letter to the Players Association, disputing the Players Association's termination of the License Agreement, on the basis of a typographical error in its termination letter. ACN stated that it would continue its business consistent with the License Agreement until December 31, 2006. *See* Verified Complaint, ¶ 42.

On November 14, 2006, the Players Association sent another letter, correcting the typographical error, again advising ACN that it had failed to make timely payment of $200,000 towards the guaranteed minimum royalty, which was due on or before June 30, 2006, and has failed to pay the sum of $350,000 which was due on or before September 30, 2006. The letter states that the Players Association "hereby terminates ACN as a licensee of the Players Association effective immediately." *See* Verified Complaint, ¶ 43. The letter also demanded for ACN to fulfill all of its post-termination obligations under the License Agreement. *See* Verified Complaint, ¶ 43.

Despite numerous letters and telephone calls from the Players Association to representatives of ACN, ACN continues to use the Players Rights in its business operations, even though its use of the Player Rights is no longer authorized by the Players Association. *See*

Heeter Declaration, ¶ 10.  ACN also continues to use the Players Association Marks, specifically the PLAYERS CLUB CHOICE and PLAYERS CHOICE and design marks, in its operations, even though it is no longer licensed to do so by the Players Association.  *See* Heeter Declaration, ¶ 10.  Further, ACN has failed to comply with any of its post-termination obligations pursuant to the License Agreement.  *See* Heeter Declaration, ¶ 10.

## ARGUMENT

### I.    Preliminary Injunction Standard.

Federal Rule of Civil Procedure 65(a) governs the issuance of preliminary injunctions. The Third Circuit Court has held that "[f]our facts, … govern a district court's decision whether to issue a preliminary injunction: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by the denial of relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party, [i.e., a balancing of the hardships]; and (4) whether granting the preliminary relief will be in the public interest. *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir. 1999) (citations, internal quotations omitted), *aff'd* 216 F.3d 1075 (3d Cir. 2000).  While a court should consider each of these elements, no one factor is determinative.  Rather, the exercise of proper judgment entails "a delicate balancing of all elements." *Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 191-92 (3d Cir. 1990).  A balancing of these factors demonstrates the Players Association's compelling right to relief.

### II.    The Players Association Will Succeed On The Merits of Its Claims.

#### A.    The Lanham Act Claim.

Trademarks are protected from infringement by Section 32 of the Lanham Act, 15 U.S.C. § 1114, and by Pennsylvania law.  15 U.S.C. § 1114(1) states that a violation of the Act occurs when someone, "without the consent of the registrant, (a) use[s] in commerce any reproduction,

6

counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). Thus, Section 32 of the Lanham Act protects registered trademarks upon a showing that the mark is valid and that there is unauthorized use by another, *i.e.*, infringement. *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 296 (3d Cir. 1986).

The elements of an unfair competition claim grounded in Pennsylvania law have been equated to those of a false-designation-of-origin claim brought under of the Lanham Act, and proof of a Lanham Act violation will create liability under Pennsylvania law as well. *See Standard Terry Mills, Inc. v. Shen Mfg. Co.,* 803 F.2d 778, 780, n. 4 (3d Cir. 1986); *Luis Vuitton Malletier and Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 582 (E.D. Pa. 2002).

The Players Association owns several trademarks such as the PLAYERS CHOICE, PLAYERS CHOICE and Design and PLAYERS CHOICE CLUB trademarks. These registered trademarks are associated with the Players Association, and such trademarks always appear on the Players Association's licensed products. Licensees are authorized to use the Players Association's trademarks because the Players Association has determined that such licensees best suit the goals of the Players Association's group licensing program.

ACN's unauthorized use of the Players Association's marks violates the Lanham Act. Consumers who see the Players Association's marks on ACN's website will mistakenly believe that ACN's clubs have been licensed, sponsored or approved by the Players Association. ACN is falsely implying the Players Association's approval or sponsorship of ACN's product, and in so doing is violating § 32 of the Lanham Act and Pennsylvania law. Moreover, by using the Players Association's trademarks without the Players Association's approval, ACN is

7

misappropriating and diluting the Players Association's trademarks. This unlawful appropriation and dilution of the Players Association's marks has injured and will continue to injure the Players Association.

### B.    Violation of Publicity Rights.

A person has the right to control the commercial use of his name and picture. *See Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 579 (1977). This right is commonly referred to as the "right of publicity," and it applies as much to performers, celebrities and athletes as to others. *Id.* (recognizing that an individual's name and likeness are valuable commodities and should not be used by another without the consent of the individual and without paying the individual for the use).

The Third Circuit Court of Appeals has adopted the reasoning set forth in *Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866, 868 (2d Cir. 1953), *cert. denied*, 346 U.S. 816 (1953), the landmark case that recognized that a right of publicity arose out of an unauthorized commercial use of baseball players' names and likenesses. *Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139, 148 (3d Cir. 1981). In *Haelan Laboratories, Inc.*, the Second Circuit Court of Appeals held:

> A man has a right in the publicity value of his photograph, *i.e.*, the right to grant the exclusive privilege of publishing his picture, and that such a grant may be validly made "in gross, *i.e.*, without an accompanying transfer of a business or of anything else" . . . This right might be called a "right of publicity." Whether it be labeled a "property right" is immaterial; for here, as often elsewhere, the tag "property" simply symbolizes the fact that courts enforce a claim which has pecuniary worth.

*Haelan Laboratories, Inc.*, 202 F.2d at 868.

The *Fleer* court recognized that a person's right of publicity is valuable and should be protected from unauthorized use:

> For it is common knowledge that many prominent persons (especially actors and ball-players), far from having their feelings bruised through public exposure of their likenesses, would feel sorely deprived if they no longer received money for authorizing advertisements, popularizing their countenances, displayed in newspapers, magazines, busses, trains and subways. This right of publicity would yield them no money unless it could be made the subject of an *exclusive* grant which barred any other advertiser from using their pictures.

*Fleer*, 658 F.2d at 148-49 (quoting *Haelan Laboratories, Inc.*, 202 F.2d at 868 (emphasis added)).

In addition to the Third Circuit Court of Appeals recognizing that a professional baseball player has the right to control the commercial use of his name and photograph, *Fleer*, 658 F.2d at 148, Pennsylvania courts have also long recognized that a person has a protectable property right in his or her name or picture. *Philadelphia Orchestra Ass'n. v. Walt Disney Co.*, 821 F. Supp. 341, 349 (E.D. Pa. 1993). As the *Philadelphia Orchestra* court stated:

> Individuals and groups hold the right to control the commercial exploitation of their inherently distinctive names and likenesses, which right is referred to as their 'right of publicity.'

*Id.* at 349.

Here, the Players Association will succeed on the merits of its right of publicity claim. It is clear that the names and pictures of Major League baseball players have commercial value, and that both the players and the Players Association have exploited that value. Further, it is undisputed that ACN's websites feature the names, pictures and descriptions of various Major League baseball players, and that ACN's is using these Player Rights for a commercial purpose. Since ACN has no license or authorization from the players or from the Players Association to use the players' names or likenesses, ACN has violated the players' well-recognized right of publicity.

**III.    The Players Association Will Be Irreparably Harmed If An Injunction Is Not Issued.**

**A.    Trademark Infringement.**

This Court may grant a preliminary injunction to prevent defendant from further violating the Lanham Act. 15 U.S.C. § 1116(a). Courts have held that in order to obtain an injunction for a Lanham Act violation, the moving party simply must show that the infringing activity is likely to confuse consumers about the source or sponsorship of the product. *See, e.g., Opticians Ass'n of America,* 920 F.2d at 196 ("Where plaintiff makes a strong showing of likely confusion, irreparable injury follows as a matter of course."); *National Football League Properties, Inc. v. New Jersey Giants, Inc.,* 607 F. Supp. 507, 516 (D.N.J. 1986).

As the Third Circuit stated in *Opticians,* 920 F.2d at 196:

> [A] preliminary injunction should usually issue when the use of a mark creates a likelihood of confusion . . . Our cases clearly say that establishing a high probability of confusion as to sponsorship almost inevitably establishes irreparable harm.

(quoting *Church of Scientology International v. Elmira Mission,* 794 F.2d 38, 41 (2d Cir. 1986)).

In fact, "an injunction is the standard remedy in unfair competition cases." 2 J.T. McCarthy, *Trademarks and Unfair Competition,* § 30:2 at 465 (2d ed. 1984), *citing National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc.,* 532 F. Supp. 651, 664 (W.D. Wash. 1982). Professor McCarthy continues, *id.* at 466: "That is, where unfair competition is proven, any doubts as to the adequacy of relief are generally resolved against the transgressor," *citing Champion Spark Plug Co. v. Sanders,* 331 U.S. 125 (1947); *see also Safeway Stores, Inc. v. Safeway Properties, Inc.,* 307 F.2d 495, 499 (2d Cir. 1962).

In *Church of Scientology,* the Second Circuit held that the unauthorized use of mark will *always* cause irreparable harm because of the loss of control over the reputation of the licensor. *Id.* at 42-44. The Court reversed the trial court's refusal to enter an injunction and ordered that an

injunction issue. *Id.* at 45; *see also KOS Pharms.,* 369 F.3d at 708; *Citizens Financial Group, Inc. v. Citizens Nat. Bank of Evans City,* 383 F.3d 110, 125 (3rd Cir. 2004) (trademark infringement amounts to irreparable harm as a matter of law); *Gucci Am., Inc. v. Daffy's, Inc.,* 354 F.3d 228, 237 (3d Cir. 2003).

Preliminary injunctions are appropriate where, as here, plaintiff is threatened with the loss of control over the reputation of its trademarks pending trial. *Pappan Enters. Inc. v. Hardee's Food Systems, Inc.,* 143 F.3d 800, 805 (3d Cir. 1998); *Opticians,* 920 F.2d at 196-97. The Players Association has a strict licensing program. Only select products and services are licensed by the Players Association. These strict licensing requirements make a Players Association license extremely valuable. Defendant's unauthorized use of the Player Rights reduces the value of such a license.

Furthermore, if the injunction is not granted, the Players Association will have no control over the quality or the quantity of ACN's products. If the Court refuses to enjoin ACN, the Players Association would be unable to prevent ACN from, for example, flooding the baseball memorabilia market with inferior products bearing the names, faces and likenesses of the Players Association's members, or from offering low-quality services that would inure to the detriment of the Players Association's reputation. As the Third Circuit has noted, "the most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendant's goods." *Opticians,* 920 F.2d at 196 (quoting *Processed Plastics Co. v. Warner Communications, Inc.,* 675 F.2d 852, 858 (7th Cir. 1982)).

**B.     Right of Publicity.**

A preliminary injunction is needed to stop ACN's violation of the players' rights of publicity. Injunctive relief is the standard remedy where publicity rights have been

11

misappropriated. *Uhlaender v. Hendricksen*, 316 F. Supp. 1277, 1283 (D. Minn. 1970). As the

*Uhlaender* court explained:

> It seems clear to the court that a celebrity's property interest in his name and likeness is unique, and therefore there is no serious question as to the propriety of injunctive relief. Defendants have violated plaintiffs' rights by the unauthorized appropriation of their names and statistics for commercial use. The remedy at law, considering particularly the difficulty in determining and measuring damages, past or future, is inadequate.

*Id.* at 1283.

*Uhlaender* is directly on point. There the Players Association sued to enjoin the sale of a

statistical baseball game being distributed without a license from the Players Association. *Id.* at

1278. The game used the names and statistics of hundreds of Major League baseball players. *Id.*

The court held that the unauthorized use violated the players' rights of publicity, and, because

monetary damages could not adequately compensate the players, preliminary injunctive relief

should be awarded. *Id.* at 1283; *see also Apple Corps. Ltd. v. Button Master, P.C.P., Inc.*, 1998

WL 126935, at *15 (E.D. Pa. 1998).

In *Ali v. Playgirl, Inc.*, 447 F. Supp. 723, 729 (S.D.N.Y. 1978), the Court granted

plaintiff's request for an injunction because it ruled that monetary damages could not adequately

compensate plaintiff for the unauthorized use of his likeness:

> As this Circuit has noted in the preliminary injunction context, "difficulty (in computing damages) is especially common when damage to reputation, credibility or good will is present." Such difficulty in determining monetary damages leaves plaintiff without an adequate remedy at law and satisfactorily establishes irreparable injury for purposes for preliminary equitable relief.

*Ali*, 447 F. Supp. at 729, *quoting Dino DeLaurentis Cinematografica v. D-150, Inc.*, 366 F.2d

373, 376 (2d Cir. 1966); *see also Durgom v. Columbia Broadcasting System, Inc.*, 214 N.Y.S.2d

752, 754 (N.Y. Sup. Ct. 1961) ("The right to enjoin a proposed use of a person's name for trade

without his written consent, is absolute, regardless of the detriment resulting to the defendant.").

1980335.2

IV.    **The Equities Favor the Players Association Over ACN.**

While the Players Association will be irreparably harmed without an injunction, such an injunction will not unfairly harm ACN. The baseball season is over, and demand for direct-marketing baseball clubs and other merchandise drops off between the World Series and the start of spring training. A preliminary injunction issued *now* will best balance the needs of the Players Association to protect its trademarks and the players' publicity rights, while not causing harm to ACN. ACN's unauthorized use of Players Rights and the Players Association's marks is likely to confuse the public and an injunction should be issued to protect the Players Association and the public from this confusion.

V.    **The Public Interest Favors An Injunction.**

The public will not be harmed by this injunction. The public will still be able to purchase high quality baseball merchandise from licensed dealers. Furthermore, consumers will no longer be confused into thinking that ACN's products are actually licensed by the Players Association. Finally, there is a significant public interest in protecting copyrights and trademarks as well as the players' rights of publicity.

**CONCLUSION**

Defendant ACN has clearly violated the rights of publicity of the Players Association's members. ACN has also violated the Players Association's trademark rights. Injunctive relief is necessary to remedy these violations. Monetary damages will not remedy ACN's past and future violations of the Players Association's rights. Only by stopping ACN's unauthorized use of the Player Rights and of the Players Association's marks will the Players Association be made whole. The balance of hardships tips decidedly in plaintiff's favor. The requested injunction is the only way that the Players Association and its player-members can protect their rights. By

13

contrast, ACN is not going to be substantially harmed.  Clearly an injunction is called for at this time.

Respectfully submitted,

CAMILLE M. MILLER
MELANIE A. MILLER
COZEN O'CONNOR, P.C.
1900 Market St.
Philadelphia, PA  19103
Phone:  (215) 665-7273
Fax:  (215) 701-2273
cmiller@cozen.com
miller@cozen.com


Of Counsel:
RUSSELL S. JONES, JR.
TRAVIS SALMON
SHUGHART THOMSON & KILROY, P.C.
Twelve Wyandotte Plaza
120 West 12th Street, Suite 1500
Kansas City, Missouri 64105
(816) 421-3355
(816) 374-0509 (Fax)
rjones@stklaw.com
tsalmon@stklaw.com


Dated:  November 28, 2006

14