## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Civil Action No. 06-5211** |
| **S.F. ADVISORS, LLC, d/b/a AFFINITY CLUB NETWORK, LLC, RAVI V. KOTHARE, and DAVID M. MASER** | ) ) ) ) ) | |
| **Defendants.** | ) | |

### PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff Major League Baseball Players Association, for its First Amended Complaint against defendants S.F. Advisors, LLC d/b/a Affinity Club Network, LLC ("ACN"), Ravi V. Kothare and David M. Maser (collectively "defendants"), states as follows:

### PARTIES

1.  Plaintiff Major League Baseball Players Association ("Players Association") is an unincorporated association organized under the laws of the State of New York, comprised of all persons who are employed as active Major League baseball players. The Players Association's principal place of business is 12 E. 49th Street, New York, New York, 10017.

2.  Upon information and belief, defendant S.F. Advisors, LLC is a Pennsylvania limited liability company located at 10 East Glenside Avenue, Glenside, PA 19038.

3.  Upon information and belief, ACN is registered as a fictitious name or d/b/a for S.F. Advisors, with a principal place of business 1500 JFK Blvd, Suite 200, Philadelphia, PA, 19102. Defendants represented that ACN is a corporation or LLC organized under the laws of the State of New Jersey, but the New Jersey Secretary of State has no record of ACN.

Dockets.Justia.com

4.    Upon information and belief, defendant Ravi V. Kothare is the chairman and CEO of ACN, and offices at ACN's principal place of business, 1500 JFK Blvd, Suite 200, Philadelphia, PA 19102.

5.    Upon information and belief, defendant David M. Maser is an officer and General Counsel of ACN. He also has offices at 3741 Ridgeview Rd., Huntington Valley, PA 19006.

### JURISDICTION AND VENUE

6.    This court has jurisdiction over this case pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338(a) and 1367(a).

7.    Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b). Defendants are residents of or have significant contacts with this judicial district. ACN's principal place of business is located in this district and Defendants offer and sell products and services in this district. Furthermore, Defendants have committed the acts complained of in this Complaint within this district.

### BACKGROUND

**A.    The Players Association's Exclusive Group Licensing Rights and Registered Trademarks**

8.    The Players Association, through written authorizations from its members, owns the exclusive world-wide right to use and license others to use the publicity rights, including without limitation the names, uniform numbers, nicknames, playing records, biographical sketches, images and likenesses, of active Major League baseball players ("Player Rights") in connection with any promotions, products, product lines and commercial projects and/or events that utilize three (3) or more active Major League baseball players.

9.    For more than forty years, the Players Association has operated a group licensing program under which persons and firms have been authorized to make commercial uses of the

2

names, likenesses and other personal indicia of active Major League baseball players on and in connection with films, television broadcasts, trading cards, apparel, posters, board games, computer and Internet games, collectibles, memorabilia and other products and services.

10.    The Players Association's exclusive group licensing rights are well-known and well-recognized in the sports licensing industry. Sellers of licensed products and services represent that such products and services are licensed by the Players Association in order to lend an aura of authenticity and, hence, greater value and credibility, to such products and services.

11.    Any person or entity desiring to make a commercial use of the publicity rights of three (3) or more active Major League baseball players must first obtain the written consent of the Players Association via a license.

12.    The Players Association has granted licenses for the use of names, likenesses and other personal indicia of active Major League players to numerous entities in a variety of business areas. Pursuant to their license agreements, such entities pay the Players Association royalties for the right to use the players' publicity rights in connection with their businesses.

13.    The Players Association is the owner of a family of trademarks incorporating the terms PLAYERS CHOICE and the goodwill associated with those marks (hereinafter the "PLAYERS CHOICE Marks or "MARKS"), including U.S. Trademark Registration No. 2,847,672 for PLAYERS CHOICE, U.S. Trademark Registration No. 2,929,068 for PLAYERS CHOICE, U.S. Trademark Registration No. 2,537,150 for PLAYERS CHOICE, U.S. Trademark Registration No. 2,553,756 for MLB PLAYERS CHOICE and Design; U.S. Trademark Registration No. 2,573,984 for MLB PLAYERS CHOICE and Design, U.S. Trademark Registration No. 2,215,399 for Baseball Player Design; U.S. Trademark Application No. 78/552,305 for PLAYERS CHOICE CLUB; U.S. Trademark Application No. 78/552,306 for

PLAYERS CHOICE PLATINUM CLUB; U.S. Trademark Application No. 78/552,308 for PLAYERS CHOICE DIAMOND CLUB; and U.S. Trademark Registration No. 2,501,504 for PLAYERS CHOICE AWARDS.

**B.     ACN**

14.     ACN is in the business of offering for sale, advertising, promoting and distributing direct-marketing baseball membership clubs.     ACN offers its club members opportunities for unique baseball-related experiences and products, as well as other services and benefits.

15.     For instance, ACN represents to its members that they are entitled to participate in city-by-city, year-round special events in which fans meet Major League baseball players in off-the-field settings.     Other membership benefits purportedly include allowing members to accumulate monthly points that can, in turn, be redeemed for authentic player autographs and passes to MLB clubs' special events, as well as for certain custom collectibles and savings on player-licensed products.

16.     Prior to and after the filing of this action, ACN offered its direct-marketing baseball membership clubs through its websites www.playerschoiceclub.com and www.playerschoicegold.com.

17.     ACN used photographs, names, likenesses and other personal indicia of active Major League baseball players in connection with its marketing and promotion of its products and services, including on its websites. *See* copy of www.playerschoicegold.com homepage, attached as Exhibit A.

18.     ACN also used the Players Association Marks, specifically the PLAYERS CHOICE CLUB marks, in connection with marketing and promoting its products and services.

*See* Exhibit A.  Indeed, the Players Association PLAYERS CHOICE CLUB mark was contained on virtually every page of ACN's website.  *See* Exhibit B.

19.    ACN's websites also specifically alleged that it is "licensed by the Major League Baseball Players Association."  *See* Exhibit A.

20.    Upon information and belief, ACN has no other officers or employees aside from Kothare and Maser.  Kothare and Maser are the alter egos of ACN and control and dominate its affairs.  As such, any obligation of ACN is enforceable against Kothare and/or Maser.

21.    Upon information and belief, the domination was used to commit a fraud and other wrongs against the Players Association that resulted in the Players Association's injury.

**C.    License Agreement Between the Players Association and ACN**

22.    On November 15, 2004, MLBA entered into a license agreement ("License Agreement") with ACN whereby the Players Association granted ACN a license to operate "player membership clubs" utilizing the PLAYERS CHOICE mark, as well as other Player Rights to provide benefits for ACN network members.  *See* License Agreement, attached as Exhibit C.  Kothare signed the License Agreement on behalf of ACN.

23.    In the License Agreement, ACN acknowledged the Players Association's exclusive group licensing rights and that ACN required a license from the Players Association to lawfully operate its direct-marketing membership clubs.

24.    Pursuant to the terms of the License Agreement, ACN was to make royalty payments to the Players Association, based on percentages of membership fees, members' purchases of products, and sale of other sports and entertainment membership clubs.  The License Agreement provided a guaranteed minimum royalty of $1,200,000 during 2006, made payable as follows: $150,000 on or before March 31, 2006; $300,000 on or before June 30, 2006;

$400,000 on or before September 30, 2006; and $350,000 on or before December 31, 2006. *See* Exhibit C, Schedule B.

25.    Pursuant to paragraph 17(a)(i)(g) of the License Agreement, the Players Association has the right to immediately terminate the Agreement where ACN "two or more times during a twelve month period fails to make timely payment of royalties when due or fails to make timely submission of royalty statements when due." *See* Exhibit C.

26.    The License Agreement also contains a "Post−Termination/Expiration" clause delineating ACN's rights and obligations once its license with the Players Association is no longer in effect ("Post-Termination Clause"). *See* Exhibit C, ¶18. That clause provides: "Upon termination of this Agreement, Licensee . . . shall have no right to offer for sale, sell, advertise, promote, and/or distribute Licensed Products or to use in any way the Rights, the Trademarks, or any Advertising and Promotional Material or Premium Products relating to the Licensed Products..." The Licensed Products are defined in the agreements as:

> Licensee shall utilize the Rights and Trademarks in connection with the marketing and administration of direct-marketing membership club(s). Such club(s) shall include a "regular" membership club and a kids' club, and Licensee may also include family, premium and/or other memberships as approved by the Players Association. Benefits offered to club members may include, but shall not be limited to, the provision of baseball-related products, services and/or events, as approved in advance in writing by the Players Association. Benefits may only be offered to club members, either for free or for a price specified in advance.

*See* Exhibit C, ¶18, Schedule B. Thus, ACN contractually agreed not to operate its membership clubs utilizing Player Rights or use the Players Association's trademarks after its license agreement with the Players Association terminated.

27.    Similarly, the Post-Termination clause required ACN, after expiration of the license agreement, to "refrain from further use of the Rights and/or the Trademarks [as those terms are defined in the agreement] or any further reference to them . . . in connection with the

6

manufacture, offering for sale, sale, advertising, promotion, publication and/or distribution of Licensee's products." *See* Exhibit C, ¶18(e).

28. The Post-Termination clause further states that upon termination by the Players Association, all royalties, including minimum guaranteed royalties, shall become immediately due and payable. *See* Exhibit C, ¶18(b).

29. The License Agreement states that "[i]n the event this Agreement is terminated for any reason, . . . full ownership and control of the membership database shall automatically transfer to MLBPA." *See* Exhibit C, Schedule B.

30. The Post-Termination clause further provides that failure to cease the advertisement, promotion and/or use of the Licensed Products will result in immediate and irreparable damage to the Players Association. ACN acknowledged that there is no adequate remedy at law for failure to cease such activities, and that the Players Association may commence an action in any court having jurisdiction and shall be entitled in such court to equitable relief and such other relief as a court may deem just and proper. *See* Exhibit C, ¶18(f).

**D.   Defendants' Fraudulent Misrepresentations.**

31. In the summer of 2004, the Players Association began business discussions with Ken Byck regarding the possible formation and implementation of a "fan rewards" program that would be marketed as a high-end product for sports fans.

32. Byck and the Players Association had previously done business together. The Players Association had confidence and trust in Byck and his business knowledge and experience, as well as his expertise with regard to baseball and baseball players.

33. During the discussions, Byck introduced Ravi Kothare to the Players Association as a potential investor in the program.

34.    As the discussions progressed in the fall of 2004, Kothare told the Players Association that he would provide the financial support for the rewards program and made representations as to his financial assets.

35.    The Players Association understood that Kothare's involvement would be financial and Kothare represented that Byck would design and oversee the program using his marketing skills, extensive baseball contacts, and general baseball industry knowledge.

36.    Prior to execution of the License Agreement, Kothare assured the Players Association that ACN was being formed as a New Jersey corporation with sufficient assets to develop and grow the business as projected and to meet projected financial obligations to the Players Association and its members.  He provided the Players Association with a list of "equity participants" in ACN, which list included Ken Byck.  *See* Exhibit I.

37.    Based upon Kothare's representations, the Players Association chose to give ACN an exclusive license for membership clubs.

38.    On November 15, 2004, Kothare signed the License Agreement in which ACN is represented as a "New Jersey corporation, with offices located at 750 Route 73 South Street, Marlton, NJ 08055.  *See* Exhibit C.

39.    Upon information and belief, ACN is only registered as a fictitious name in Pennsylvania and has never been a New Jersey corporation.  Further, the Players Association has been unable to locate *any* state in which ACN is incorporated or organized.

40.    Upon information and belief, S.F. Advisors, LLC, is a Pennsylvania limited liability company.  S.F. Advisors subsequently filed a fictitious name registration to use ACN as the name under which it does business.

41.    Neither Ravi Kothare nor David Maser ever advised the Players Association before the execution of the License Agreement that ACN was not incorporated -- as they represented in the License Agreement – but is merely a fictitious name for which S.F. Advisors does business.

42.    The Players Association would not have licensed ACN if it had known that Kothare's representations were false.

43.    In spring 2005, the Players Association became concerned about numerous operational and marketing difficulties at ACN and learned that Ken Byck's role in the operations of ACN had been significantly diminished by Kothare.  The Players Association expressed its concerns to Kothare and Kothare gave assurances of Byck's continued involvement.

44.    During the first half of 2005, ACN committed multiple breaches of the License Agreement, including, but not limited to: (1) failing to seek or secure the Players Association's approval on promotional and/or advertising material; (2) distributing items utilizing the Players Rights without approval of the Players Association; (3) failing to make timely payments of $75,000 towards the minium royalties under the agreement; (4) and communicating information derogatory in nature to third parties about the Players Association and its licensed product.

45.    Upon information and belief, ACN's breaches resulted, at least in part, from Kothare's exclusion of Byck from key decisions of the business.  Without Byck, ACN did not have the requisite knowledge or experience in licensing, sports marketing or the baseball industry.

46.    Because of these multiple breaches, the Players Association terminated ACN on or about July 9, 2005.  *See* 7/9/05 termination e-mail to Kothare, attached as Exhibit J.

47.    During a meeting on July 11, 2005, Kothare and Maser agreed to give various financial and operational assurances to the Players Association in exchange for continuation of the License Agreement.

48.    Kothare signed a personal guaranty to secure the remainder of unpaid 2005 royalties owed to the Players Association.  *See* Exhibit K.

49.    The personal guaranty signed by Kothare stated that ACN was a "New Jersey corporation."

50.    Maser, General Counsel for ACN, sent the signed guaranty to the Players Association and thereby vouched for its accuracy..  Neither Kothare nor Maser told the Players Association at any time that ACN was not incorporated.

51.    Prior to ACN's reinstatement, the Players Association believed, based on Kothare's representations, that Ken Byck was an equity participant and still actively involved in ACN.  The Players Association informed Kothare and Maser that ACN needed staff with sufficient marketing and baseball knowledge to operate the business, and Kothare and Maser also represented that they would hire additional staff with appropriate expertise to ensure there would be no further problems.

52.    Upon information and belief, these representations were knowingly false and made intentionally to induce the Players Association to reinstate ACN as a licensee.

53.    Based on Kothare's and Maser's assurances and representations, the Players Association reinstated ACN as a licensee.

54.    The Players Association reasonably relied on Kothare's and Maser's assurances in reinstating ACN as a licensee.  Indeed, without these assurances and representations, the Players Association would not have reinstated ACN as a licensee.

10

55.    The Players Association learned in fall 2005 that Ken Byck's equity participation in ACN had not been finalized, and again the Players Association advised Kothare of the importance of Byck's involvement in the company.  In November 2005, Kothare represented that the agreement with Ken Byck "was done."   Contrary to his representations, Kothare never concluded the agreement granting equity participation from Ken Byck, although Byck signed the agreement and returned it to Kothare.

56.    Upon information and belief, Kothare and Maser exercised complete domination of ACN with respect to the issues and allegations contained herein.

57.    Upon information and belief, Kothare and Maser did not observe corporate formalities.

58.    Upon information and belief, Kothare and Maser exercised total discretion with regard to ACN's business and the use of its funds.

59.    Upon information and belief, Kothare and Maser sold additional "equity" interests in ACN to other individuals who were never disclosed to the Players Association.

60.    Upon information and belief, Kothare did not invest his own funds in ACN as represented to the Players Association.

61.    Through Kothare and Maser's domination of ACN, they caused ACN to infringe upon the Players Association's trademarks, unfairly compete in violation of Section 43(a) of the Lanham Act, misappropriate the publicity rights of hundreds of active Major League baseball players, breach the terms of the License Agreement, and commit fraud against the Players Association.

**E.    ACN's Breaches of the License Agreement**

62.    In 2006, ACN failed to make timely payment of $200,000 towards the guaranteed minimum royalty, which was due on or before June 30, 2006. ACN also failed entirely to pay the sum of $350,000, which was due on or before September 30, 2006.

63.    On October 23, 2006, the Players Association notified ACN that its License Agreement had been terminated. *See* October 23, 2006, letter, attached as Exhibit D.

64.    In the termination letter, the Players Association advised ACN of certain post-termination obligations, including (1) payment of the remainder of the 2006 minimum royalty guarantee in the amount of 700,000; (2) discontinuation of all use of licensed Rights and Trademarks; and (3) forwarding an electronic file and printed copy of ACN's membership database. *See* Exhibit D.

65.    On October 25, 2006, ACN sent an e-mail notification to its current members that utilized the PLAYERS CHOICE mark and indicated that member benefits would continue until December 31, 2006. *See* October 25, 2006, e-mail, attached as Exhibit E.

66.    ACN's indication that membership benefits will run through the end of 2006 is contrary to the immediate termination provisions in the License Agreement. Further, ACN's e-mail suggested that new club(s) in 2007 will continue to utilize Player Rights, which is also contrary to the post-termination provisions and ACN's acknowledgement of the Player Association's rights contained in the License Agreement. *See* Exhibit E.

67.    On November 2, 2006, the Players Association's outside counsel sent a letter to ACN, demanding that ACN immediately cease its use of the Players Association's Marks, cease

any activity which utilizes the Player Rights without authority from the Players Association, and to fulfill its post-termination obligations pursuant to the License Agreement. *See* Exhibit F.

68.    On November 7, 2006, ACN sent a letter to the Players Association, disputing the Players Association's termination of the License Agreement on the basis of a typographical error in the termination letter. ACN stated position was that the Players Association's October 23, 2006, letter indicated that the missed royalty payments were not within a twelve-month period, and thus not grounds for termination. *See* Exhibit G. ACN also stated that it would continue its business consistent with the License Agreement until at least December 31, 2006.

69.    On November 14, 2006, the Players Association sent another letter, correcting the typographical error, again advising ACN that it had failed to make timely payment of $200,000 towards the guaranteed minimum royalty, which was due on or before June 30, 2006, and has failed to pay the sum of $350,000 which was due on or before September 30, 2006. The letter states that the Players Association "hereby terminates ACN as a licensee of the Players Association effective immediately." *See* Exhibit H. The letter further demanded that ACN fulfill all of its post-termination obligations under the License Agreement.

70.    Despite numerous letters and telephone calls from the Player Association to representatives of ACN, ACN continued to use the Players Rights in its business operations, even though its use of the Player Rights is no longer licensed by the Players Association.

71.    ACN also continued to use the Players Association Marks, specifically the PLAYERS CHOICE and PLAYERS CHOICE and Design marks, in its operations, even though it is no longer licensed to do so by the Players Association.

72.     ACN has also failed to comply with its post-termination obligations pursuant to the License Agreement.  The Players Association has not received any payment from ACN since termination.

## COUNT I
## TRADEMARK INFRINGEMENT (15 U.S.C. § 1114)
### (All Defendants)

73.     The Players Association incorporates herein by this reference paragraphs 1 through 72 above.

74.     Defendants' continued use after the termination of the License Agreement of the Players Association's registered PLAYERS CHOICE and MLB PLAYERS CHOICE and Design marks in commerce in connection with the sale, offering for sale, distribution, or advertising of its goods and services violates the Lanham Act, 15 U.S.C. § 1114, because defendants' unauthorized use of the Players Association's marks is likely to cause confusion, or to cause mistake, or to deceive consumers into believing that ACN's goods or services are authorized or sponsored by, or affiliated, associated or connected with, Major League baseball players or their exclusive licensing agent the Players Association, when such is not the case.

75.     As a result of defendants' violation of the Lanham Act, the Players Association and its members have been injured in an amount not presently known.  At a minimum, the Players Association is entitled to a recovery of damages of the amounts owed under the License Agreement and, in addition, an award of defendants' profits from its infringing actions.

76.     The Players Association is without an adequate remedy at law.  Defendants' violation of the Lanham Act irreparably injures the players and the Players Association.  The Players Association asks that the court  permanently enjoin defendants from continuing the use of all the Players Association's Marks, as well as the names, nicknames, likenesses, images,

playing records or other personal indicia of active Major League baseball players in connection with its direct-marketing baseball clubs or other commercial endeavors.

77.     Defendants' wrongful conduct is knowing, willful and intentional and the Players Association is entitled to treble profits or damages, whichever is greater, and attorneys fees under Section 35 of the Lanham Act.

**COUNT II**
**UNFAIR COMPETITION (15 U.S.C. § 1125(a))**
**(All Defendants)**

78.     The Players Association incorporates herein by this reference paragraphs 1 through 77 above.

79.     The use in commerce by defendants after the termination of the License Agreement of the marks PLAYERS CHOICE, PLAYERS CHOICE CLUB and MLB PLAYERS CHOICE and Design in connection with its goods and service has likely caused confusion, mistake, and/or deception as to the affiliation, connection, or association of defendants with the Players Association, or as to the origin, sponsorship, or approval of ACN's goods, services or commercial activities by the Players Association.

80.     The terms PLAYERS CHOICE, PLAYERS CHOICE CLUB and MLB PLAYERS CHOICE and Design used by defendants after the termination of the License Agreement are identical to the Players Association's PLAYERS CLUB marks.

81.     Purchasers were likely to purchase defendants' products and services based on the false association with the Players Association's products and services, thereby resulting in the loss of sales to the Players Association.

82.     The Players Association has no control over the quality of goods and services offered by defendants and, because of the confusion as to source engendered by defendants, the

15

Players Association's valuable goodwill in its trademarks is damaged by the actions of defendants.

83.    Additionally, defendants falsely imply that the Players Association has approved or authorized ACN's clubs by affirmatively representing on the website after the termination of the License Agreement that ACN is "licensed by the Major League Baseball Players Association," when such is not the case.

84.    Defendants' actions constitute unfair competition, false representation and false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §§ 1125(a) and (d).

85.    Defendants' unfair competition, false representation and false designation of origin has been willful, deliberate and designed specifically to trade upon the goodwill associated with the Players Association's services and trademarks.

86.    These wrongful acts have caused the Players Association substantial injury, including loss of customers, damage to its goodwill, confusion of existing and potential customer, injury to its reputation and diminution of the value of its trademarks and products.

87.    The Players Association has sustained irreparable harm due to the danger of injury to its reputation and goodwill caused by defendants' infringement of the Players Association's trademarks, and the amount of damage will be difficult to ascertain if these acts continue.

88.    The Players Association is entitled to the relief provided in 15 U.S.C. §§ 1117, including the recovery of (1) defendants' profits; (2) any damages sustained by the Players Association; (3) the cost of this action; and (4) reasonable attorney's fees incurred by the Players Association in bringing this action. Further, the Players Association is entitled to an entry of

judgment for three times such profits or damages, whichever is greater, together with prejudgment interest on such amount pursuant to the provisions of 26 U.S.C. § 6621.

## COUNT III
## RIGHT OF PUBLICITY (MISAPPROPRIATION)
### (All Defendants)

89.    The Players Association incorporates herein by reference paragraphs 1 through 88 above.

90.    The publicity rights of active Major League baseball players are valuable commercial properties, and the right to use and license others to use these rights in groups of three (3) or more belongs exclusively to the Players Association.  The Players Association has for approximately 40 years licensed those publicity rights for the benefit of its members, exercising quality control over licensed products and collecting fees and royalties.

91.    Defendants were on notice that the Players Association had terminated the License Agreement on October 23, 2006.  Defendants have not had since that date, the consent of the Players Association to use the players' publicity rights.

92.    By using the publicity rights of hundreds of active Major League baseball players without the Players Association's consent after the termination of the License Agreement, defendants have misappropriated the identity of those players for defendants' commercial benefit.

93.    As a result of defendants' misappropriation of the players' names, identities, and likenesses, the Players Association and its members have been injured in an amount not presently known.  The Players Association is entitled to recover such damages.

94.    Notwithstanding any damages that might be recoverable for these infringements, the Players Association is without an adequate remedy at law.  Defendants' misappropriation of

the players' names, identities and likenesses irreparably harms the players and the Players Association, depriving them of the right to control the commercial use of their publicity rights and by potentially diluting the value of the Players Association's licenses.  The Players Association asks that the court permanently enjoin defendants from offering direct-marketing baseball membership clubs, or from any other commercial activity that in any manner use the names, identities, likenesses, images, playing records or other personal indicia of active Major League baseball players.

95.    In addition, the Players Association should be awarded attorneys' fees incurred in connection with this cause of action.

## COUNT IV
## BREACH OF CONTRACT
## (ACN)

96.    The Players Association incorporates herein by this reference paragraphs 1 through 95 above.

97.    As alleged above, ACN entered into a License Agreement with the Players Association allowing ACN, strictly in accordance with the terms of that agreement, to use the Players Association's Marks, as well as the right to utilize the publicity rights of active Major League baseball players, in ACN's direct-marketing baseball clubs.

98.    Pursuant to the License Agreement, ACN was to make royalty payments to the Players Association, based on percentages of membership fees, members' purchases of products, and sale of other sports and entertainment membership clubs.  The License Agreement provided certain guaranteed minimum royalties that were to be made payable during the course of 2006.

99.    Pursuant to the License Agreement's Post-Termination Clause, ACN agreed not to utilize the Players Rights for commercial purposes, or use the Players Association's Marks, after the conclusion of its agreement with the Players Association.

100.    ACN continued to use the Players Rights in its business operations, even though its use of the Player Rights is no longer licensed by the Players Association.

101.    ACN also continued to use the Players Association Marks, specifically the PLAYERS CHOICE and PLAYERS CHOICE and Design marks, in its operations, even though it is no longer licensed to do so by the Players Association.

102.    ACN has also failed to comply with its post-termination obligations pursuant to the License Agreement. Upon termination, the unpaid balance of the 2006 minimum guaranteed royalty became immediately due, yet, the Players Association has not received any payment from ACN since termination. Both of ACN's websites remained active, and ACN failed to forward the membership database to the Players Association, until January 2007.

103.    Given these various license provisions, ACN, by continuing to advertise, promote and use the names and identities of active Major League baseball players, as well as the use of the Players Association's marks, after expiration of its license agreement with the Players Association, is in flagrant and willful breach of the contract.

104.    As a result of ACN's breach of the License agreement, the Players Association and its members have been injured in an amount not presently known but at the very least equal to the amount of unpaid royalties. The Players Association is entitled to the recovery of damages and, in addition, to an award of defendants' profits from its wrongful actions.

105.    Additionally, as ACN acknowledged in the License Agreement, the Players Association is without an adequate remedy at law. ACN's breach of contract irreparably injures

the players and the Players Association.  The Players Association asks that the court grant permanent injunctive relief enjoining ACN from (1) continuing the use the names, nicknames, likenesses, images, playing records or other personal indicia of active Major League baseball players; (2) any and all use of the PLAYERS CHOICE CLUB and/or PLAYERS CHOICE and Design marks in any format whatsoever, including the use of the marks on ACN's websites; (3) billing of current memberships; (4) selling of new memberships and renewals.  The Players Association also asks the court to order ACN, pursuant to the terms of the Post-Termination provision in the License Agreement, to (1) immediately pay the Players Association all guaranteed minimum royalties; (2) refund all payment made by members for months beyond October, 2006, including prorated refunds on annual memberships; and (3) immediately send to the Players Association an electronic file, with an attached printed hard copy, of the entire membership database including the name, address, e-mail address, membership start date, membership status, membership payment date and method for each member separately.

106.    Because of Kothare's and Maser's control and domination of ACN, they should be held personally responsible and liable for ACN's breach of the License Agreement.

### COUNT V
### FRAUDULENT MISREPRESENTATION
### (All Defendants)

107.    The Players Association incorporates herein by this reference paragraphs 1 through 106 above.

108.    Kothare told the Players Association prior to the execution of the License Agreement that he would provide the necessary financial support for the rewards program and that Ken Byck would design and oversee the program.

109.    Kothare also told the Players Association before the License Agreement was executed that ACN was being formed as a New Jersey corporation with sufficient assets to develop and grow the business as projected and to meet projected financial obligations to the Players Association and its members.

110.    On November 15, 2004, Kothare signed the License Agreement in which ACN is represented as a "New Jersey corporation, with offices located at 750 Route 73 South Street, Marlton, NJ 08055.

111.    Upon information and belief, ACN is only registered as a fictitious name in Pennsylvania and has never been registered as a corporation in New Jersey or any other state. Instead, ACN is a d/b/a for S.F. Advisors, LLC.

112.    Neither Ravi Kothare nor David Maser ever advised the Players Association before the execution of the License Agreement that ACN was not incorporated -- as it stated in the License Agreement – but is merely a fictitious name under which S.F. Advisors does business.

113.    Upon information and belief, Kothare also did not invest his own funds in ACN as represented to the Players Association.

114.    After the execution of the License Agreement, the Players Association became concerned about numerous operational and marketing difficulties at ACN and learned that Ken Byck's role in the operations of ACN had been significantly diminished by Kothare.  The Players Association expressed its concerns to Kothare and Kothare gave assurances of Byck's continued involvement.

115.    Kothare's misrepresentations about ACN's corporate status, operations, and financial support were material misrepresentation of fact, in that it was important to the Players

21

Association that an entity to which it was giving an exclusive license was in all respects as it was represented to be.

116.    The Players Association reasonably relied on Kothare's misrepresentations about ACN's corporate status, operational structure, and financial condition, in its decision to originally license ACN.    The Players Association would not have originally licensed ACN if it had known that Kothare's representations were false.

117.    The Players Association terminated ACN on or about July 9, 2005, for multiple breaches of the License Agreement.

118.    Upon information and belief, ACN's breaches resulted, at least in part, from Kothare's exclusion of Byck from key decisions of the business.  Without Byck, ACN did not have the requisite knowledge or experience in licensing, sports marketing or the baseball industry.

119.    Subsequent to ACN's termination, Kothare and Maser agreed to give various financial and operational assurances to the Players Association in exchange for continuation of the License Agreement.

120.    As part of the assurances, Kothare signed a personal guaranty to secure the remainder of unpaid 2005 royalties owed to the Players Association.  The personal guaranty signed by Kothare stated that ACN was a "New Jersey corporation."  Maser, General Counsel for ACN, sent the signed guaranty to the Players Association and thereby vouched for its accuracy.

121.    Neither Kothare nor Maser told the Players Association at that time (or any time) that ACN was not incorporated or that Kothare had not invested his own funds in ACN as represented to the Players Association.

122.    Further, the Players Association also believed prior to reinstating ACN as a licensee, based on Kothare's representations, that Ken Byck was an equity participant and still actively involved in ACN.  The Players Association informed Kothare and Maser that ACN needed staff with sufficient marketing and baseball knowledge to operate the business, and Kothare and Maser also represented that they would hire additional staff with appropriate expertise to ensure there would be no further problems.

123.    Based on Kothare's and Maser's assurances and representations, the Players Association reinstated ACN as a licensee.

124.    Upon information and belief, Kothare never finalized the equity participation agreement with Byck, and also forced Byck out of any meaningful role in ACN, contrary to Kothare's representations to the Players Association.

125.    The Players Association reasonably relied on Kothare's and Maser's financial and operational assurances in  reinstating ACN as a licensee.  Indeed, without these assurances and representations, the Players Association would not have reinstated ACN as a licensee.

126.    The representations and omissions made by defendants were known to be false by defendants, or were recklessly made without knowledge of their truth or falsity.  The representations were made intentionally to induce the Players Association to originally license ACN and subsequently to reinstate ACN as a licensee after it was terminated.  Given their complete failure to abide by the representations, the only reasonable conclusion to be drawn is that neither Kothare nor Maser had any intention of fulfilling their promises.

127.    The Players Association has sustained damage from defendants' fraudulent misrepresentations through loss of value in the Players Association's Marks including "PLAYERS CHOICE" because of ACN's failed business; the Players Association gave up its

right to license anyone else for the same concept by selecting and giving ACN an exclusive license;  damages for unpaid minimum royalties pursuant to the license; and other damages in amounts to be determined at trial.

WHEREFORE, for the foregoing reasons, the Players Association hereby prays for the following relief:

(1)    permanent injunctive relief enjoining defendants from (a) continuing the use the names, nicknames, likenesses, images, playing records or other personal indicia of active Major League baseball players; (b) any and all use of the Players Association's Marks, including the PLAYERS CHOICE CLUB, PLAYERS CHOICE and/or PLAYERS CHOICE and Design marks, in any context or format whatsoever, including the use of the marks on ACN's website; (c) billing of current memberships; and (d) selling of new memberships and renewals; and

(2)    an Order directing defendants to (a) make immediate payment of all guaranteed minimum royalties; (b) refund all payments made by members for months beyond October, 2006, including prorated refunds on annual memberships; and (c) immediately send to the Players Association an electronic file, with an attached printed hard copy, of the entire membership database including the name, address, e-mail address, membership start date, membership status, membership payment date and method for each member separately; and

(3)    an award of damages to compensate the Players Association for the losses it has suffered as a result of Defendants' wrongful conduct;

(4)    an accounting and disgorgement of defendants' profits associated with its direct-marketing baseball clubs;

(5)    a trebling of such monetary awards under the Lanham Act;

(6)    pre-judgment interest;

(7)     an award of attorneys' fees and costs; and

(8)     any and all other relief that this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

The Players Association demands a trial by jury on all issues so triable.

Respectfully submitted,

_Camille M. Miller_

NEAL D. COLTON
CAMILLE M. MILLER (CMM1101)
of
COZEN O'CONNOR, P.C.
1900 Market St.
Philadelphia, PA  191033508
Phone:  (215) 665-2060
Fax:  (215) 701-2060

RUSSELL S. JONES, JR.          MO #30814
TRAVIS SALMON                  MO #53090
of
SHUGHART THOMSON & KILROY, P.C.
Twelve Wyandotte Plaza
120 West 12th Street, Suite 1500
Kansas City, Missouri 64105
(816) 421-3355
(816) 374-0509 (Fax)
rjones@stklaw.com
tsalmon@stklaw.com

ATTORNEYS FOR PLAINTIFF
MAJOR LEAGUE BASEBALL
PLAYERS ASSOCIATION

## **CERTIFICATE OF SERVICE**

I hereby certify that on this date, I caused a true and correct copy of the foregoing First

Amended Complaint to be served via First Class Mail, postage pre-paid upon:

Neil E. Jokelson
David Jokelson
Neil E. Jokelson & Associates, P.C.
230 S. Broad Street
18th Floor
Philadelphia, PA  19102

Dated: February 16, 2007

Catherine M. Branka, Paralegal